IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


BOBBY LEE FLUKER,

      Plaintiff,

vs.                                                              4:99cv20-WS

LARRY CAMPBELL,
SARASWATHI B.
TIRUMALASETTY,[1] M.D. ,
and PATRICIA CATES,

      Defendants.

_____/


## REPORT AND RECOMMENDATION

Pending are Defendants' special reports, docs. 30 and 32, and supporting exhibits.  *See* docs. 30 and 33.  The special reports were previously construed as motions for summary judgment.  Doc. 35.  Plaintiff, an inmate proceeding *pro se*, was advised of his obligation to respond to the motions, *id.*, and his response is doc. 39, along with supporting affidavits.  Doc. 38; doc. 39, ex. A.

---

[1] It appears from Dr. Saraswathi Tirumalasetty's affidavit, doc. 33, that her last name has been incorrectly spelled as Tirumalasetly.  The Clerk is directed to note this change on the docket.

ENTERED ON DOCKET $8-11-00$ BY DDJ
[Rules 58 & 79(a) FRCP or 32(d)(1) & 55 FRCRP]
Copies mailed to: Fluker, Jolly, Fromm, Mobile

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA.
TALLAHASSEE, FLA.

00 AUG 11   PH 4: 23

FILED

33

## I.    Allegations of the Complaint

Plaintiff's § 1983 complaint alleges that while he was a pretrial detainee at the Leon County Jail,[2] he was denied appropriate medication and treatment in violation of the Eighth Amendment.  Doc. 1.  As a result of this lack of care, Plaintiff developed gangrene and his entire left leg had to be amputated.  *Id.* Plaintiff also alleges that his rights to equal protection were violated when he was denied appropriate medical treatment because he was a federal prisoner.  He contends that county prisoners received proper medical attention.  Plaintiff seeks compensatory and punitive damages.  *Id.*  He demands trial by jury.

## II.    Standard of Review

On a motion for summary judgment, Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).  If they do so, the burden shifts to the Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.* Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  There must be such evidence

---

[2] Plaintiff alleges he was arrested by United States Marshals and placed in the Leon County Jail.  It is presumed that he was not a sentenced prisoner.

2

that a jury could reasonably return a verdict for the party bearing the burden of proof. Anderson v. Liberty Lobby, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986). However, "the evidence and inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party, and all reasonable doubts are resolved in his favor." WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir. 1988).

III.   **Relevant Rule 56 Evidence**

Plaintiff was arrested on February 14, 1997, doc. 1, and taken to the Leon County Detention Facility (hereinafter "jail."). Doc. 39, ex. A (hereinafter "Plaintiff's affidavit"), ¶ 2. He remained there until April 8, 1997. *Id*.

Plaintiff entered the jail with an infected injury to the fifth toe on his left foot. Plaintiff's affidavit, ¶ 3.[3] It was noted on the intake medical record that Plaintiff was taking some prescribed medications, but he did not know the name of the medications. Doc. 30, ex. B, attached ex. A, p. 2, and ex. C, pp. 34-35.[4] The

---

[3] Plaintiff's complaint clarifies that Plaintiff was a pre-trial detainee. He injured his toe on February 1, 1997, when he tripped at work. Doc. 1, p. 2. e "sustained a swollen and lacerated toe." *Id.* Plaintiff sought medical treatment for his injury at Tallahassee Memorial Hospital on February 3rd. *Id.* He was given an antibiotic, treated, and released. *Id.*, at 3.

[4] Exhibit B is the affidavit of Patricia Cates (hereinafter "Cates affidavit"). Attached to her affidavit are exhibits A through M which have been tabbed. Hereafter, unless otherwise noted, references to doc. 30 and exhibits will be to the medical records which have been tabbed as exhibits A through M. Additionally, the undersigned has numbered the pages of the exhibits in the bottom right-hand corner for ease of reference.

intake screening form also has a notation in the upper right-hand corner which appears to list two Tallahassee pharmacies, presumably where Plaintiff's medications were obtained. Doc. 30, ex. A, p. 2; *see also* ex. C, p. 34. Also during his intake screening, it was noted that he had a prior history of poor circulation in his left leg and had had vascular surgery. Doc. 30, ex. A, p. 2.

On February 15, 1997, Plaintiff complained of being in "great pain" and it was noted that he walked with a very pronounced limp. Doc. 30, ex. C, p. 35. Plaintiff complained to the medical staff that he needed his antibiotic prescription for his foot. Plaintiff's affidavit, ¶ 5. Plaintiff has testified that Defendant Cates "refused to provide any treatment to [his] foot at that time" and did not give him any medication. *Id.*[5] His health care records show that he was given Advil. Doc. 30, ex. C, p. 35. Pharmacy records from Eckerds were searched to obtain the names of his medications. *Id.* It was determined that Plaintiff had been taking, among other medications, 250 mg. of Keflex[6] four times a day and had three days remaining on his prescription at the time of his incarceration. Doc. 30, ex. C, p. 34; Plaintiff's affidavit, ¶ 4. Dr. Tirumalasetty has stated in her affidavit that on February 15th, she was "advised over the telephone" that Plaintiff was taking prescriptions "at the time of his incarceration." Doc. 33, ¶ 3. Dr. Tirumalasetty

---

[5] Defendant Cates is the "Administrator of Health Services at the Leon County Detention Facility," Cates Affidavit, ¶ 1, and is also a registered nurse. *Id.*

[6] This is an antibiotic, used to treat skin infections. PHYSICIANS DESK REFERENCE, 959 (2000).

4

"approved the continuation of these medicines at the [jail] for the amount of medication remaining on his prescription as follows:  Keflex 250 mg four times a day for 3 days, Pravachol 20 mg daily for 4 days, and Lasix 40 mg daily for 5 days."  *Id.*; *see also* doc. 33, ex. A.  It appears that Plaintiff was given these medications.  Doc. 30, ex. E, p. 7.

Plaintiff's sister, Betty Chestnut, also requested medical attention for Plaintiff on February 15th.  Doc. 38, p. 1.  She has submitted an affidavit in which she states that on that day, she called and spoke with Defendant Campbell and complained that her brother needed his medication.  *Id.,* at 1.  She "was told by the Sheriff [that] his Department would take care of all of his medical problems and he didn't need any outside help on what his Department should and shouldn't do."  *Id.*  Two days later, Chestnut called Defendant Campbell again "demanding medical treatment for [her] brother . . . ."  *Id.*  She was told the Sheriff was unavailable and would return her call.  *Id.*  When he did not call her back, she called again "later that afternoon and evening demanding that [she] speak with the Sheriff but he was not available to speak with [her]."  *Id.*, at 2.

Plaintiff "made numerous written requests for treatment to both Nurse Cates and Sheriff Campbell for [his] prescribed medication for [his] lacerated and grossly infected toe, but Sheriff Campbell gave no reply and Nurse Cates refused."  Plaintiff's affidavit, ¶ 6.  Plaintiff also "made numerous requests and demands to see a medical doctor concerning [his] grossly infected toe and pain in [his] left leg."

5

*Id.*, at 7.  Between February 15th and March 17, Plaintiff states that he "wrote 3 requests to Sheriff Campbell" to see the doctor.  *Id.*  He received no response.  *Id.*  Three requests were also sent to Defendant Cates with no response.  *Id.*  Plaintiff contends that between February 15th and February 28th, he made numerous requests to receive some medicine, and complained about the pain in his toe, foot, and leg.  *Id.*, at 8.  He says that he received no "medical attention, treatment, medication or anything related to medical care . . . ."  *Id.*

The medication and treatment records for Plaintiff indicate that he was given Keflex until February 18th, and Provachol and Lasix until February 20th.  Doc. 30, ex. E, p. 7.  Additionally, a notation in Plaintiff's health care records reveals that on February 17th, a records search was initiated.  Doc. 30, ex. C, p. 34.  On the next day, an incidental entry again noted poor circulation.  *Id.*, at 32.  Cellulitis[7] in the toe was noted as well as "severe varicose veins."  *Id.*  The final notation for February 18th states, "Schedule follow up next week, 2/26."  *Id.*

A receipt for medication from Eckerds was completed on February 21, 1997.  Doc. 30, ex. C, p. 31.  Plaintiff submitted a request for health services on February 21st, complaining about his "legs and chest."  Doc. 30, ex. M, p. 2.  He was told that he was "scheduled to see the PA about [his] problem."  *Id.*[8]  It appears that

---

[7] Cellulitis is "inflammation of connective tissue."  WEBSTER'S MEDICAL DESK DICTIONARY, 106 (1986).

[8] There is a physician order for February 21, 1997, for Plaintiff to receive Pravachol, Ultram, and Furosimide.  Doc. 30, ex. D.  This appears to be a

he was given prescriptions for Provachol and Lasix from February 22nd through the 28th. Doc. 30, ex. E, p. 7.[9]

On February 25th, Plaintiff refused to undergo a physical examination. Doc. 30, exhibits B, p. 1, and C, p. 32.[10] However, on February 27th, Plaintiff complained again about his foot. Doc. 30, ex. C, pp. 28-29. An injury/illness report states that he complained that his little toe on his left foot was infected. *Id.* He was placed in the infirmary for Dr. Tirumalasetty to see him. *Id.*

On February 28, 1997, Plaintiff requested that Sergeant Smith examine his "swollen and discolored foot." Plaintiff's affidavit, ¶ 10. Smith "personally escorted" Plaintiff to the medical department where he received a "foot soaking" to cleanse the infected area. *Id.*, at 9-10. By this point, the infection had spread and the treatment did not help. *Id.*, at 9. His health care record indicates that Plaintiff told staff that he was still having problems with his toe. Doc. 30, ex. C, p. 28. He also reported that he was on antibiotics prior to coming to the jail. *Id.* It was noted that the little toe had the nail missing and was not healed. *Id.* No "reddness [sic] or drainage" was noted, but there was "macerated area under toe [and] 3rd

---

continuation of the medications prescribed prior to Plaintiff's arrest. Doc. 30, ex. C.

[9] This exhibit has not been explained by Defendants. Ex. E. The dates on which medications were given to Plaintiff as indicated in this exhibit do not appear to be the same as noted in Plaintiff's health care records as provided in exhibit C.

[10] Another receipt for medication was received from TMH on February 25th. Doc. 30, ex. C, p. 30. However, this form indicates that no pills remained. *Id.*

toe." *Id.* No antibiotics were issued. Plaintiff's affidavit, ¶ 9. Plaintiff was released back to general population. Doc. 30, ex. D, p. 5.

A second call was placed to Dr. Tirumalasetty on February 28th. Doc. 33, ¶ 4. She was advised that Plaintiff "had recently completed antibiotic treatment for an infection of his left fifth toe." *Id.* She was also "advised that medical personnel would continue to provide daily Betadine foot soaks and [she] released the [Plaintiff] to his pod." *Id.; see also* doc. 33, ex. A. The health records indicate that the file would be referred "to MD for eval. of further care." Doc. 33, ex. C, p. 28.

On or about March 6th, Plaintiff requested Lieutenant Jackie Martin look at his foot. Plaintiff's affidavit, ¶ 11. She also escorted Plaintiff "to medical and demanded that [he] be given immediate treatment for [his] infected foot." *Id.* Medical staff noted circulatory problems in his leg and "mild edema" on his left foot. Doc. 30, ex. C, p. 28. His left toe was "swollen" and he complained of pain. *Id,* at 27-28. He was placed in the infirmary. *Id.,* at 28. Dr. Tirumalasetty was called again and advised that his toe had not improved and that he needed antibiotics for the infection. *Id.*; doc. 33, ¶ 5. She "ordered another prescription of antibiotics, Erythromycin 500 mg three times a day for seven days." Doc. 33, ¶ 5. Plaintiff states, and the medical records show, that this was the first time in 20 days that he was prescribed an antibiotic at the jail. Plaintiff's Affidavit, ¶ 11. He was also "placed on a list to see the" jail physician. *Id.* The "Betadine foot soak [was] done" as well. Doc. 33, ex. C, p. 28.

8

Another entry in Plaintiff's health care records for later in the day on March 6th indicates that he was still complaining of pain in his left foot. Doc. 33, ex. C, p. 27. It was noted that his left foot appeared swollen with a "dark discoloration." *Id.* He was given medication as ordered. *Id.* On the 7th, Plaintiff stated, "My left foot is bad." *Id.* It was noted that his left fifth digit "has crusted exudate [and] blood around nail. Slightly edematous." *Id.* He was given another foot soak with Betadine. *Id.* Later that day he was again released from the infirmary. *Id.;* doc. 30, ex. D, p. 4.

On March 9th, there is a notation that his foot was soaked as ordered, and Plaintiff "tolerated" the treatment well. Doc. 33, ex. C, p. 27. On March 11th, his medications were reviewed. *Id.*

After speaking with Plaintiff on March 15th, Plaintiff's sister "again called the Sheriff and complained that [her] brother desparately [sic] needed medical attention to his left foot and leg." Doc. 38, p. 2. As before, Chestnut "was told that the Sheriff was unavailable and he would call [her] when available." *Id.* Although she has not identified the specific dates or times, Chestnut avers that she called Defendant Campbell on several other occasions "relating the seriousness of [her] brother's" condition. *Id.* She "demanded medical attention for [her] brother and that the Doctor see [her] brother with some regularity." *Id.*

On March 17th, Plaintiff submitted a request for health services. Doc. 30, ex. M, p. 1. In this request, Plaintiff stated, much has he had before:

9

> I need to see an [sic] doctor immediate [sic]. My toe, and leg are swollen. I cannot sleep at nite [sic] or day. Pain in my toe, up to my leg throbing [sic] every second. I been taken [sic] antibotics [sic] for a week. I have not seen a doctor yet. For 30 dy. I been [sic] in pain. Please get me some help.

Doc. 30, ex. M, p. 1. The response he received was that he was "scheduled to see Dr. Sara." *Id.*[11]

Plaintiff was examined for the first time by Dr. Tirumalasetty some thirty-one days after being received at the jail, on March 17th.[12] Plaintiff's Affidavit, ¶ 12. Plaintiff stated that he was in pain. Doc. 30, ex. C, p. 25.[13] The antibiotics had ended. *Id.* As Dr. Tirumalasetty examined Plaintiff, she noted his "left fifth toe was swollen and infected." Doc. 33, ¶ 6; doc. 30, ex. C, p. 25. "Since the Erthromycin had not helped, [she] prescribed Keflex 500 mg three times a day and Motrin 400 mg three times a day for 14 days, along with daily dressing changes and the application of antibiotic ointment for 7 days." Doc. 33, ¶ 6; *see also* Plaintiff's Affidavit, ¶ 12; doc. 30, ex. D, p. 3.

Dr. Tirumalasetty has testified that she visited the jail three days a week and "would examine and treat inmates as necessary." Doc. 33, ¶ 2. She "reviewed the medical records of each inmate at least once a week." *Id.* Additionally, when

---

[11] This apparently is a nickname for Doctor Tirumalasetty.

[12] Dr. Tirumalasetty, M.D., works under a contractual agreement with the Leon County Sheriff's Department, and is a Board Certified Psychiatrist. *See* doc. 33.

[13] This entry incorrectly states that Plaintiff was injured two weeks ago rather than two weeks prior to coming to the jail. Doc. 30, ex. C, p. 25.

10

Dr. Tirumalasetty "was at the [jail], the [jail's] medical staff would consult with [her] by telephone to assist in the care and treatment of the inmates." *Id.*

Plaintiff's records indicate that he was treated on March 18th and 19th. Doc. 33, ex. C, p. 25.[14] On March 20th, Plaintiff was given the foot soak and it was noted that some edema and tenderness persisted. *Id.*, at 21. No drainage was noted. *Id.* On the 21st, his foot was soaked again and it was noted that there was a "[s]light gape" at the top distal portion of toe. *Id.* Again, no drainage was detected. *Id.* On March 24th, Plaintiff complained of chest pain and leg pain.[15] *Id.* His blood pressure was 150 over 110. *Id.* He reported that his left leg "gave out" on him. *Id.*, at 19. The injury/illness report notes that there was an ulcer on anterior surface of his left, lower leg. *Id.* He also had an "ulcerated toe (5th) left foot." *Id.*[16] He was given a permission slip to "keep (L) leg elevated as long as possible." Doc. 30, ex. H, p. 1.

On March 26th, Plaintiff's sister called and spoke with Defendant Cates about Plaintiff. Doc. 38, p. 2. She also mentioned the possibility that Plaintiff might have diabetes. Doc. 38, p. 2; doc. 30, ex. C, p. 21; *see also* Cates Affidavit, ¶ 8. Defendant Cates "refused to discuss or talk about" Plaintiff's foot

---

[14] During this time he also had an unrelated problem with his lip. *Id.*

[15] Plaintiff has a history of heart problems. *See* doc. 30, ex. J.

[16] Apparently, earlier in the day on March 24th, Plaintiff "did not feel like getting out of bed to" go get his medicines. Doc. 30, ex. G. Plaintiff refused to sign the "release of responsibility" form. *Id.* He also refused medications on February 25th and March 19th. *Id.*

11

or leg problem, but indicated he "would be for checked for diabetes."  Doc. 38, p.
2. Cates "immediately provided this information to the physician's assistant . . .
and blood test were conducted."  Cates Affidavit, ¶ 8.  These tests were
performed on March 27th and reported on March 28th.  Doc. 30, ex. K, pp. 2-3.
The tests confirmed that he was not diabetic.  Cates Affidavit, ¶ 8.

Chestnut "called Nurse Cates on several other occasions complaining about
the poor medical treatment" of her brother.  Doc. 38.  The exact dates and times
are not given.  Defendant Cates "refused to discuss" Plaintiff's medical condition
with Chestnut.  *Id.*

On March 27th, Plaintiff again complained of severe leg pain.  Doc. 30, ex.
C, p. 18.  Although much of the notation in Plaintiff's record for this day is difficult
to decipher, what is evident is that there is a diagnosis of "cellulitis/gangrene."  *Id.*
It was noted that his foot was swollen, the area was tender to palpation, the fifth
digit was "draining," and pulse was distant.  *Id.*  He was to be taken to Tallahassee
Memorial Regional Medical Center for consultation.  *Id.*  Plaintiff was given Advil for
leg pain.  *Id.*  An additional notation for that day shows the skin was dark, the fifth
digit toenail was dark and the other nails were yellow in color.  *Id.*, at 16.
Plaintiff's foot was warm to the touch, "no pedal pulse felt."  *Id.*  He was given
200 mg of Advil for pain.  *Id.*

Apparently, Plaintiff was examined by an outside physician, Dr. Jeffrey W.
Crooms on March 27th.  Doc. 30, ex. J, p. 2; *see also* doc. 33, ¶ 8.  Plaintiff

12

reported to Dr. Crooms that he was "in quite a bit of discomfort" and had "developed some sores of the left leg." Doc. 30, ex. J, p. 2. Plaintiff stated that he had a "history of poor circulation" and previously had "surgery in the left groin in regards to blood flow to that leg . . . ." *Id.* Dr. Crooms found Plaintiff had "a necrotic[17] left fifth toe." *Id.* It appeared to have "dry gangrene." *Id.* Dr. Crooms expected that Plaintiff would lose the fifth toe. *Id.* He recommended that Plaintiff be examined by a vascular surgeon. Doc. 30, ex. J, p. 2; doc. 33, ¶ 8.[18]

On March 28th, Plaintiff complained of pain. Doc. 30, ex. C, p. 16. He reported, "My toe is gone. Something needs to be done." *Id.* Edema was noted, but no drainage. *Id.* The color was dark and his foot was warm to the touch. *Id.* Medication was given as ordered. *Id.* Later that day, Plaintiff was again complaining of severe pain. *Id.* At this point there was a "scant amount" of bloody drainage from his fifth digit. *Id.* It was noted that there was also "old crusted blood" and that the color remained dark. *Id.* He was to be kept in the infirmary for observation. *Id.*

Plaintiff complained of pain on March 29th. Doc. 30, ex. C, p. 15. There was tenderness to his left foot, dark coloration, and blood drainage. *Id.* Skin was warm to the touch and an open area on left leg was noted. *Id.* He was given his

---

[17] Necrosis is "death of a portion of tissue differentially affected by local injury." WEBSTER'S MEDICAL DESK DICTIONARY, 466 (1986).

[18] He also noted "some concern about [Plaintiff] having diabetes" and recommended that he be evaluated for diabetes. Doc. 30, ex. J.

medications and the leg was cleansed. *Id.* The notation for March 30th indicates "no significant change" and Plaintiff continued to complain of pain. *Id.* His toe was "dark [and] necrotic." *Id.* "No petal pulse noted." *Id.* He remained under observation. *Id.*

On March 31, 1997, he complained of the pain in his left foot and toes. Doc. 30, ex. C, pp. 13, 15. He reported that nothing was relieving his pain. *Id.* His "small toe" was "black in color." *Id.* It was also noted that his "left 5th digit [was] withered approx. ¾ inch from top." *Id.* The nurse reported being "unable to [check] for blanching due to yellow toe nails [and] blackened skin." *Id.* There is an additional notation on this day that Plaintiff has "already been referred to vascular surgeon." *Id.; see also* doc. 30, ex. I, p. 5. Later, Plaintiff reported that his foot hurt "bad" and he had "not slept for 2 months." Doc. 30, ex. C, p. 13. He was now given Tylenal for pain. *Id.*

Dr. Tirumalasetty examined Plaintiff for the second time on March 31st. Plaintiff's Affidavit, ¶ 13. Dr. Tirumalasetty was aware at this point that Plaintiff had been scheduled by someone else in the medical department to go to Tallahassee Memorial Hospital to see a specialist. *Id.*; doc. 33, ¶ 8. It appears that his medications were adjusted. Doc. 33, ex. E, pp. 3-4. She signed a request for Plaintiff to have an "outside referral" to a vascular surgeon for "gangreen [sic] left little toe." Doc. 30, ex. I, p. 2. Her request was designated as an emergency. *Id.*

14

On April 1st, it was noted that his left fifth digit remained "shruncken."  Doc. 30, ex. C, p. 11.  He continued to complain of pain and was given Tylenol and his other medications.  *Id.*  His condition was "unchanged."  *Id.*  Also noteworthy on this date is that Lieutenant Fair gave permission for a consultation by a vascular surgeon.  *Id.*  On April 2nd, an x-ray was taken and "provided no appreciable findings."  *Id.*  The radiology report did state, gangrene in left foot, and a comment was added, "If the possibility of osteomyelitis[19] is suspected continued follow up would be recommended."  Doc. 30, ex. L, pp. 1, 3.  His foot was soaked again.  Doc. 30, ex. C, p. 11.  His reports of pain continued, as did the dark discoloration of his left foot, especially the left little toe.  *Id.,* at 9.  By April 3rd, Plaintiff was being given extra-strength Tylenol for his complaints of "severe pain."  *Id.*  There was no improvement.  *Id.*  Gangrene was noted again.  *Id.*  His condition remained unchanged for the next several days, although he reported that the area between his fourth and fifth toes was opened.  *Id.,* at 8.  He was told to keep his foot elevated.  *Id.*  Plaintiff was also to be given 600 mg of Ibuprofen for ten days.  Doc. 30, ex. D, p. 2; *see also* doc. 30, ex. C, p. 6.

On April 7th, 1997, Plaintiff complained that his toe was "busted open" and was "hurting pretty bad."  Doc. 30, ex. C, p. 5.  It was noted that there was also a "foul odor."  *Id.*  On April 7th, Defendant Cates "spoke with Lt. William Fair, [her]

---

[19] Ostomyelitis is "an infectious inflammatory disease of bone marked by local death and separation of tissue."  WEBSTER'S MEDICAL DESK DICTIONARY, 502 (1986).

15

supervisor, and recommended that [Plaintiff] be hospitalized so that antibiotics could be administered intravenously."  Cates Affidavit, ¶ 9; *see also* doc. 30, ex. C, p. 5.  Plaintiff's medical records also include the notation by Defendant Cates that "Lt. Fair states he will talk to the administration and judge to see what can be done to get VOP charges dropped."  Doc. 30, ex. C, pp. 5-6.

Plaintiff also was examined for the third and final time by Dr. Tirumalasetty this same day.  Doc. 33, ¶ 9.  Dr. Tirumalasetty had been advised that Plaintiff faced the possibility of being released the next day.  *Id.*  She noted that he had an ulcerated sore on his left leg and gangrenous toe.  Doc. 30, ex. C, pp. 3-4.  She "strongly recommended to him to he keep his scheduled appointment with the vascular surgeon and instructed the Facility's medical personnel to advise him of the same upon release."  Doc. 33, ¶ 9.  Later that evening Plaintiff complained of persisting pain.  Doc. 30, ex. C, p. 3.  It was noted that he was "grimacing" from the pain and, although he was wearing white socks, a bloody drainage was visible. *Id.*

Plaintiff was released on April 8, 1997.  Doc. 30, ex. C, p. 3.  Someone from medical called the doctor's office (Dr. Long) and reported that Plaintiff had been released, but was instructed to keep his appointment.  *Id.;* doc. 30, ex. C, p. 1.  One of the last notations in his medical records states that the doctor's office "will work with him re: finances [and] assistance."  Doc. 30, ex. C, p. 1.

16

The day after his release, on April 9th, Plaintiff admitted himself into the hospital and was seen by a specialist.  Plaintiff's affidavit, ¶ 14.  He was diagnosed with a severe case of gangrene and scheduled for surgery.  Plaintiff's affidavit, ¶ 14.  On April 11th, half of Plaintiff's left foot was amputated.  Plaintiff's affidavit, ¶ 14.  Ultimately, Plaintiff had to return to the hospital on May 15th and have his entire left leg[20] amputated.  Plaintiff's affidavit, ¶ 15.

As additional evidence, Defendant Cates stated in her affidavit that she did not refuse Plaintiff access to medical services or medication, and "never personally had direct communication with [Plaintiff]."  Cates Affidavit, ¶¶ 6-7.  As the Administrator, Cates states that she did "not generally provide clinical medical services to inmates."  *Id.*, at 6.  Furthermore, she stated that "[d]uring much of" the time Plaintiff was housed at the jail, she was "on sick-leave status which greatly reduced any opportunity [she] would have had to communicate with [Plaintiff] . . . ."  *Id.*, at 12.

Defendant Campbell[21] has submitted an affidavit in which he states that "as a normal practice," he does not "become personally involved in the handling of complaints of any nature raised by inmates."  Doc. 30, ex. A (hereinafter "Campbell Affidavit"), ¶ 2.  He testified that he "had no personal involvement in the

---

[20] His leg was amputated from the hip down.  Plaintiff's affidavit, ¶¶ 14-15.

[21] Defendant Larry Campbell is the Sheriff of Leon County, Florida.  Campbell Affidavit, ¶ 1.

administration of medical treatment to Plaintiff nor did [he] have personal
knowledge of Plaintiff or his alleged cause of action prior to the filing of his
Complaint." *Id.*, at 3. Defendant Campbell also states that inmate complaints
normally do not require his attention "as they are delegated to other officers for
investigation." *Id.*, at 5.

## IV.   Legal Analysis

### A.   Medical care

Deliberate indifference to the serious medical needs of sentenced prisoners
violates the Eighth Amendment's prohibition of cruel and unusual punishment.[22]
Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Analysis of
an Eighth Amendment medical care claim requires two steps: first it must be
determined whether there are sufficient allegations of a serious medical need; and if
so, whether a defendant's response to that need constituted deliberate indifference.
Mandel v. Doe, 888 F.2d 783, 788 (11th Cir. 1989).

A "'serious' medical need is one that has been diagnosed by a physician as
mandating treatment or one that is so obvious that even a lay person would easily
recognize the necessity for a doctor's attention." Hill v. Dekalb Regional Youth

---

[22] As a pretrial detainee, Plaintiff's claims are founded upon Fourteenth
Amendment Due Process. That standard, however, is the same as the Eighth
Amendment prohibition against cruel and unusual punishment which applies to
sentenced prisoners. Hamm v. DeKalb County, 774 F.2d 1567, 1571 and 1574
(11th Cir. 1985), *cert. denied*, 475 U.S. 1096 (1986).

18

Detention Center, 40 F.3d 1176, 1187 (11th Cir. 1994), quoting Laaman v.

Helgemoe, 437 F.Supp. 269, 311 (D. N.H. 1977).

The second element of the claim, "deliberate indifference," is a culpable state

of mind of the defendant to unnecessarily and wantonly inflict pain or harm to a

prisoner by depriving him of a basic human need.  Negligence is not enough to

violate the constitution.  Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 115

L.Ed.2d 271 (1991).  Thus, medical malpractice does not constitute deliberate

indifference.  Estelle, 429 U.S. at 106, 97 S.Ct. at 292.

### B.    Defendant Cates

Plaintiff avers that Cates did not provide any treatment nor administer any

medication to him on February 15th.  However, his medical records reveal that calls

were made to attempt to obtain Plaintiff's medications as he did not know what

they were.  Additionally, he was given Advil by the charge nurse.  Although this

was apparently not Defendant Cates, his complaints were taken seriously at that

time and treatment was provided.

Plaintiff also avers that he "did not receive any medical attention" from Cates

between February 15th and February 28th, despite "numerous requests" and

complaints about his toe.  Id.  Besides Plaintiff's affidavit, there is evidence that

Plaintiff made one request for treatment on February 21.  This request was

answered by a nurse, but not by Defendant Cates.  There is no evidence that

Plaintiff specifically addressed a request to Defendant Cates, and no evidence that

19

during this period of time, Defendant Cates was aware of Plaintiff's complaints but failed to respond.

The evidence submitted by Plaintiff's sister concerning Defendant Cates reveals that she acted promptly in scheduling Plaintiff to be evaluated for diabetes. That Defendant Cates would not speak with the sister about Plaintiff's medical condition does not evidence deliberate indifference to his medical needs as it is unknown whether such demands upon Cates's time would have impeded her work in caring for other prisoners. Therefore, that being the extent of the evidence against Defendant Cates, summary judgment should be granted in her favor.

## D.     Defendant Campbell

To prove that a Sheriff has acted with deliberate indifference to a prisoner's medical needs, a plaintiff must show: (1) plaintiff suffered from a serious medical need, (2) the Sheriff was deliberately indifferent to that need, and (3) the Sheriff's deliberate indifference caused the plaintiff-prisoner to suffer harm. Marsh v. Butler County, Ala., 212 F.3d 1318, 1330 (11th Cir. 2000) (affirming the denial of a Rule 12(b)(6) motion where plaintiff alleged sheriff had established a policy), *citing* McElligott v. Foley, 182 F.3d 1248, 1254-55 (11th Cir. 1999). Sheriff Campbell does not personally provide medical care to prisoners in his custody. He does, however, have supervisory responsibility over the operation of the jail.

Ordinarily, a Sheriff will not be subject to liability in a claim of deliberate indifference to serious medical needs because *respondeat superior* is not a basis for

20

liability in § 1983 cases.  Polk County v. Dodson, 454 U.S. 312, 325, 102 S. Ct.

445, 70 L. Ed. 2d 509 (1981); Harvey v. Harvey, 949 F.2d 1127, 1129 (11th Cir.

1992), citing Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct.

2018, 56 L. Ed. 2d 611 (1978).  If there is no evidence of a policy of practice

established by the Sheriff, there must be some personal involvement by the Sheriff

such that he could be liable for his own actions or omissions.  Thus, a plaintiff must

demonstrate that a Sheriff "knew or should have known of" a prisoner's need for

medications or medical treatment.  Nelson v. Prison Health Services, Inc., 991 F.

Supp. 1452, 1461 (M.D. Fla. 1997) (granting summary judgment to Sheriff

because plaintiff did not "allege facts tending to show that the Sheriff knew or

should have known of [plaintiff's] need for her medications or her subsequent need

for medical treatment.").  If there is evidence that a Sheriff had specific information

revealing a potential problem and, despite that knowledge, took no affirmative

action to correct the problem, he could be liable.  See Harris v. Coweta County, 21

F.3d 388, 390-91 (11th Cir. 1994) (denying sheriff's motion for summary

judgment based on qualified immunity where sheriff intentionally delayed medical

treatment so as to shift cost to state); Merideth v. Grogan, 812 F. Supp. 1223,

1230 (N.D. Ga. 1992) (denying summary judgment motion because of disputed

material facts and noting that Sheriff was personally aware that prisoner was highly

intoxicated and was taken into custody because he was threatening to kill himself).

21

In his affidavit, Plaintiff asserted that he made numerous requests for medical treatment to Defendant Campbell. There is no documentary evidence to confirm this. Even so, there is evidence that Plaintiff's sister personally spoke with Defendant Campbell the day after Plaintiff's arrest. She told Defendant Campbell that Plaintiff needed his medication, and expressed concern for Plaintiff's health and medical treatment. There is evidence that Defendant Campbell was dismissive to Chestnut, but he did give assurances to her that Plaintiff's problems would be handled. There is also evidence that Chestnut tried repeatedly to get in touch with Defendant Campbell to no avail. She was told by unnamed officials that Defendant Campbell would return her calls, but he never did.

Thus, there is a dispute about whether Defendant Campbell had "personal knowledge" about Plaintiff's medical needs when he arrived at the jail. Defendant Campbell's affidavit expressly disclaims any such knowledge. However, Plaintiff's evidence is that Defendant Campbell personally spoke with Chestnut the day after Plaintiff was taken into custody about Plaintiff and his need for his medication, and on summary judgment, Plaintiff's evidence must be deemed to be true. Plaintiff's evidence, construed in the light most favorable to him, could be that Defendant Campbell closed his eyes to a potential problem by refusing to speak with Plaintiff's sister.[23] Supervisory officials have been held liable when they have made "a

---

[23] There are obvious administrative reasons why a sheriff cannot personally speak to every person who calls, but the evidence will be construed in a light most favorable to Plaintiff.

22

conscious choice to close [their] eyes and cover [their] ears to the clamor of the complaints." *See* Cox v. District of Columbia, 821 F. Supp. 1, 20 (D. D.C. 1993) (police brutality case); Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). In Shaw v. Stroud, the court noted that where a supervisor has actual or constructive knowledge that a "pervasive and unreasonable risk" of constitutional injury exists, the supervisor's response to that knowledge may be deemed "so inadequate as to show 'deliberate indifference.'" 13 F.3d at 799. It was suggested that an instance of deliberate indifference existed where "Stroud never bothered to return Harvey Paul Walker's phone calls although he knew that Morris had possibly 'roughed up' Walker." *Id.* Nevertheless, it is undisputed here that the jail health care intake procedures were functioning properly at this time. Jail health care staff knew that Plaintiff had an infected toe, knew that he had circulatory problems in that leg, and continued his antibiotic medication. There is no evidence of liability *at this point* even though there is a dispute of fact.

There is no evidence that thereafter, Defendant Campbell was made personally aware that Plaintiff's condition was developing into gangrene and that his subordinates were not providing appropriate treatment to prevent the development of gangrene. Therefore, Defendant Campbell cannot be personally liable. *Compare,* Lancaster v. Monroe County, Alabama, 116 F.3d 1419,1427 (11th Cir. 1997) (sheriff did not have qualified immunity because he was told that Plaintiff would have a seizure within eight to ten hours if he did not get alcohol or

23

medication, and that he had almost died from his last such seizure, and that he needed urgent medical attention).

This does not end the analysis, however. There is evidence that in the final week, before Plaintiff was released to have his foot and then his leg amputated, officials employed by Defendant took steps to have Defendant released so that he could obtain health care elsewhere. Patricia Cates was involved with this, as well as Lieutenant Fair, and both make policies for the Sheriff. Doc. 30, ex. C, pp. 4-5. The evidence before this time, which will be discussed ahead with respect to Dr. Tirumalasetty, shows an extended period of time when (1) the physician did not see Plaintiff, perhaps because she did not have time, (2) health care staff subordinate to Cates and the physician did not continue antibiotics or bring Plaintiff's slowly growing crisis to the physician's attention, (3) no attempts were made to provide some other more aggressive care, outside the jail, and (4), when gangrene was manifest, there was further delay to cause the release of Plaintiff so as to shift the cost of surgery to another agency. A jury might reasonably conclude from this that urgent medical care was delayed for weeks and then avoided to shift the cost away from the Sheriff as an official policy of the Sheriff. *See* Harris v. Coweta County, 21 F.3d at 390-91. Consequently, while summary judgment should be granted to Defendant Campbell in his individual capacity, it should be denied in his official capacity.

24

### E.    Dr. Tirumalasetty

There is evidence that Dr. Tirumalasetty was available at the jail to visit patients three times a week.  There is evidence that she reviewed the medical charts of inmates every week.  There is also evidence, therefore, that she knew or reasonably should have known from the intake physical and subsequent medical notes that Plaintiff had a history of poor circulation, that his toe was infected from an injury, and that he complained continuously about pain in his left foot.

Plaintiff was placed in the infirmary several times for an examination by Dr. Tirumalasetty, but she did not see him on those occasions and he was released back to general population.  Two different correctional officers saw Plaintiff's foot and, as lay persons, recognized the urgent need for more aggressive medical treatment.  He was taken to the medical department and given prescriptions for antibiotics, but still did not see Dr. Tirumalasetty.  His foot was not healing with the treatments provided, but was getting worse.  Plaintiff complained about his foot repeatedly.  Medical staff called Dr. Tirumalasetty a number of times regarding Plaintiff's medical need.  In light of Plaintiff's history of poor circulation, a jury could reasonably conclude that a reasonable physician, not deliberately indifferent to a serious medical need, would have examined Plaintiff's toe prior to March 17th, when Dr. Tirumalasetty first examined the toe.

Plaintiff's symptoms continued to worsen.  Yet Dr. Tirumalasetty did not examine Plaintiff's foot again until March 31st.  At some time during the period

25

from March 17th to March 31st, gangrene developed because on March 27th, someone else in the medical department diagnosed Plaintiff's condition as gangrene. A jury could conclude that it was deliberately indifferent to Plaintiff's serious medical need for Dr. Tirumalasetty to have not examined Plaintiff's foot before March 31st.

Plaintiff was then was referred to an outside physician by someone other than Dr. Tirumalasetty. Even then, Plaintiff was not examined again by Dr. Tirumalasetty for another week. Additionally, as noted above, jail officials went through the extraordinary procedure of seeking to have charges against Plaintiff dropped to secure his release so that he could obtain medical treatment.

All of this adds up. Because deliberate indifference may be satisfied by something less than an intent to cause harm, see Farmer v. Brennan, 114 S. Ct. 1970, and recklessly disregarding a risk may expose an official to a due process claim in a medical care claim by a pretrial detainee, a jury could find that Dr. Tirumalasetty's actions exhibited deliberate indifference to Plaintiff's serious medical needs. Stated another way, there is a triable issue of deliberate indifference to a serious medical need.

As a final matter, Dr. Tirumalasetty has raised qualified immunity as a defense, but that defense is not available. It was well established prior to Plaintiff's incarceration as a pretrial detainee in 1997 that deliberate indifference to a prisoner's serious medical needs violates the Constitution. Estelle v. Gamble, 429

26

U.S. 97 (1976).  Furthermore, the delay of urgent medical treatment for

non-medical reasons is deliberate indifference.  Ancata v. Prison Health Services,

Inc., 769 F.2d 700, 704 (11th Cir. 1985).  Qualified immunity is not available here.

### F.    Equal protection

Plaintiff has failed to come forward with any evidence to support his claim

that his rights under the Equal Protection Clause have been violated.  There is no

evidence that Plaintiff was treated any differently than other inmates based on his

race, religion, or gender.  Nor is there any comparison of the treatment given to

Plaintiff and the treatment given to other prisoners, similarly situated.  Summary

judgment should be granted in favor of all Defendants on this claim.

### V.    Conclusion

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants

Cates and Campbell's summary judgment motion, doc. 30, be **GRANTED in part**,

that judgment be entered in favor of Cates and Campbell in their individual

capacities, and that the motion be **DENIED** as to Campbell in his official capacity

with respect to the medical care claim; that Dr. Tirumalasetty's summary judgment

motion, doc. 32, be **DENIED** regarding the claim for a denial of medical care, but

**GRANTED** on the equal protection claim; that counsel be appointed for Plaintiff;

27

that a period of discovery by permitted after appointment of counsel; and that the

case be set for a jury trial.

**IN CHAMBERS** at Tallahassee, Florida, this __11th__ day of August, 2000.

**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.